UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
AMERICAN EXPRESS MARKETING AND          :
DEVELOPMENT CORP. and AMERICAN EXPRESS  :
TRAVEL RELATED SERVICES COMPANY, INC.,  :     10 Civ. 1605 (DLC)
                        Plaintiffs,     :
                                        :     OPINION & ORDER
             -v-                        :
                                        :
BLACK CARD LLC,                         :
                        Defendant.      :
----------------------------------------X

Appearances:

For plaintiffs:

David H. Bernstein
Eric D. Meyer
Josephine D. Coakley
Debevoise & Plimpton, LLP
919 Third Avenue, 31st Floor
New York , NY 10022

For defendant:

Peter D. Vogl
Lee A. Armstrong
Jones Day
222 East 41st Street
New York, NY 10017

Nicole Gueron
Emily Reisbaum
Gregory A. Clarick
Clarick Gueron & Reisbaum LLP
40 West 25th Street, 12th Floor
New York, NY 10010

Michael T. Hornak
Natalie M. Gowin
Ronald P. Oines
Rutan & Tucker LLP
611 Anton Blvd, Suite 1400
Costa Mesa, CA 92626-1931

DENISE COTE, District Judge:

Plaintiffs American Express Travel Related Services Company, Inc., and American Express Marketing & Development Corporation (collectively "Amex")[1] challenge the registration of the trademark "BLACKCARD" by defendant Black Card LLC ("BC"), and have brought various other claims under the federal Lanham Act, 15 U.S.C. §§ 1051 et seq., and New York state law.  BC's one remaining counterclaim seeks a declaratory judgment that Amex has never used the marks at issue here.

Both parties have moved for summary judgment.  This Opinion addresses the cross motions for summary judgment on Amex's § 2(e) cancellation claim.  For the reasons set forth below, Amex's motion is granted.


BACKGROUND

I.   The Centurion Card

     A. Amex's Payment Network

The following facts are undisputed, unless otherwise stated.  Amex is a leading provider of credit card and related financial and consumer services.  There are two types of credit cards that run on Amex's payment network.  "Proprietary" cards

---

[1] American Express Travel Related Services Company, Inc., licenses trademarks from its subsidiary, American Express Marketing & Development Corporation.  For purposes of this Opinion, no distinction need be drawn between these entities.

are issued directly by Amex.  "Network" cards run on the Amex payment network but are not issued by Amex itself; rather, co-branding banks issue the cards in partnership with a division of Amex called Global Network Services ("GNS").

Like many credit card issuers, Amex has sought to use color as a key branding mechanism for its cards.  As a core element in a card's broader graphic design, color functions not merely to distinguish an issuer's card from competing cards of different issuers, but also to distinguish among cards emanating from the same issuer.

Amex has been particularly successful in wielding this color branding strategy.  Its first card, originally issued in 1958, was purple.  That card became the now-ubiquitous "Green Card," the color of money, in 1969.  Next in line came the "Gold Card", first issued in 1966.  In 1984, continuing to mine the vein of precious metals, Amex issued its "Platinum Card".[2]  By the mid-1980s, Amex had established the framework for a color-based hierarchy of credit cards.  The cards are chiefly distinguishable based on the increase in benefits available at

---

[2] The Platinum Card's color would be more commonly recognized as silver.  Gold trumps silver in the public eye, and so American Express faced the branding challenge of demonstrating that its newest card exceeded the Gold Card in services, benefits, fees, and prestige.  Platinum being more valuable than gold, it did so by placing the word "Platinum" on the card.  By contrast, American Express's Green, Gold, and Centurion cards do not bear an identifying label; rather, color itself is the major distinguishing characteristic.

each level and larger annual fees associated with each card. As benefits are for the most part linked to the amount a consumer charges to his or her card (for example, extra mileage in an airline's frequent flier program), a higher spender would likely choose to upgrade from a Green to a Gold Card, and from Gold to Platinum -- in theory, greater benefits justify the higher fee. Amex continued with variations on the color-coded theme, launching "Blue from American Express" (a no-fee card, clear with a blue square in the center) in 1999, the "Plum Card" (purple-colored, for small businesses) in 2007, and the "Zync Card" (white-colored, with customizable benefits) in 2010.

B. Development of the Centurion Card

In 1998, Amex began development of the "Centurion Card", which it issued in the United Kingdom that same year and the United States in 1999. The Centurion Card is black in color, with the imprinted head of a Roman Centurion behind the cardholder's number at its center. At present, the Centurion Card sits at the pinnacle of the Amex hierarchy of cards.[3] It is issued by invitation only to existing Gold and Platinum cardmembers who meet a minimum threshold for annual charges on their cards. Chief benefits include upgrades and accelerated

---

[3] At some time prior to 1998, Amex distributed a black-colored membership card to a limited number of high-value private banking customers.

mileage on a number of airlines, room and service upgrades at various hotel chains, and access to a personal "concierge".

In 1999, Amex sent an "invitation letter" ("1999 Invitation Letter") to potential Centurion cardholders.[4]  In the letter, Kenneth Chenault, then Amex's President and Chief Operating Officer, introduced Centurion by stating that "a rumor has persisted that American Express issues a black charge card to a select group of Cardmembers."  While the 1999 Invitation Letter consistently referred to the "Centurion Card" and "Centurion membership," it closed with the following:  "The black card may have started out as a rumor.  However, now you have a chance to become one of the first, and I might add, one of the few, to actually carry the legendary black card -- the Centurion Card from American Express."

C. An Amex "Black Card"?

Amex registered "Centurion" as a service mark with the United States Patent and Trademark Office ("PTO") in September 2001.  In choosing the name "Centurion" for its new premium card, Amex rejected at least some candidates for names that included the words "Black Card," such as "AXP Black Card".

---

[4] This practice has continued.  Amex solicits new Centurion cardholders by invitation to customers who already have an Amex card; it does not have an application process for Centurion.

Nevertheless, Amex executives expected prospective consumers to refer to the card as Amex's "Black Card."[5]

Amex executives and employees have referred to Centurion as Amex's "black card" or "Black Card", albeit sporadically, in external communications since 1999.  For instance, Hayes stated in a speech to The Executive Council, a corporate networking group, "One of [Amex's] best products has no advertising whatsoever.  In fact[,] American Express spends exactly zero dollars marketing it . . . [I]t is the Centurion card – affectionately known in the market place as the Black Card."  In general, however, Amex follows a strict protocol whereby formal communications with Centurion cardholders refer to the card as "Centurion" with no reference whatsoever to a "black card" or the "Black Card".

---

[5] In his deposition testimony, Amex Chief Marketing Officer John Hayes ("Hayes") was asked whether he remembered internal debate about the "Centurion" name in 1998 and 1999.  He responded:

> The conversation in the company was between whether or not we should be calling it the Centurion Card in our marketing materials or whether or not we should be referring to it as The Black Card or Black Card.  And where we netted out was that we recognized that the world at large would refer to it as The Black Card.  But that we wanted to give it a name that was steeped in our history and something that we felt would be very closely associated with American Express from its history.  So we chose to formally call it the Centurion Card, but recognized that it was informally going to be referred to as The Black Card.

From its launch in 1999, Amex's Centurion brand has achieved significant and enduring visibility in the media and popular culture.  In those domains, Amex's premier product is referred to almost exclusively as its "black card."  The voluminous record in this case includes 245 news articles, dating from 1987 to 2011, making reference to an Amex "black card".[6]  In popular culture, Amex's "black card" has come to be associated with wealth, extravagant luxury, and the celebrity lifestyle, with references and appearances in song lyrics, movies, and television shows.

While Amex does not engage in traditional advertising for Centurion, it does actively pursue product placement in films for Centurion.  It has also sought targeted media coverage for "members-only" Centurion events with celebrities in attendance, anticipating that some coverage would refer to Centurion as Amex's "Black Card" or else use the terms interchangeably.

In the wake of Centurion's launch and ensuing media and cultural exposure, other credit and charge card issuers sought to introduce black-colored products with premium benefits aimed at affluent consumers.  Those running on the Amex payment

---

[6] Five of these articles predate Centurion's 1999 launch, and refer to an Amex "black card" in connection with rumors of a mystical "black card" offered solely to global elites.  The remainder use "black card" in connection with the Centurion card.

network and issued in partnership with Amex's GNS division included the Citi Chairman Card, the Bank of America Accolades Card, the Virgin Atlantic Black Card, and the Banco Popular Black Card.  Amex's GNS and Proprietary divisions are separate. Therefore, a premium card running on the Amex payment network but issued by a co-brand partner bank is considered a Centurion competitor.  At least one black-colored credit card, the Sotheby's Card, has run on MasterCard's payment network.

D. Amex's Trademarks

Amex has applied for and registered trademarks with the PTO in conjunction with its various cards, including "AMERICAN EXPRESS GREEN CARD,"[7] "PLATINUM CARD," "BLUE FROM AMERICAN EXPRESS," "PLUM CARD," and "ZYNC CARD".  Amex also trademarked "GOLD CARD"; that mark was held to be generic, however, in 1988. See American Express Co. v. MasterCard Int'l Inc., 685 F.Supp. 76, 78 (S.D.N.Y. 1988).  In 2004, Amex applied to the PTO to trademark "BLACK FROM AMERICAN EXPRESS".  That trademark was never registered, however; the PTO issued a notice of abandonment in 2007 after Amex failed to file a statement of use.

---

[7] As part of the registration process, the PTO directed American Express to disclaim any exclusive right to use the phrase "GREEN CARD apart from the mark as shown because it merely describes a feature of the mark."

As noted above, in partnership with Amex's GNS division, several banks have issued black-colored credit cards running on the Amex payment network.  As it does in connection with all of its proprietary cards, Amex has issued naming conventions for the black cards.  These conventions are intended to ensure that consumers do not confuse network cards with the Centurion.  The conventions specify that the name of the issuer must be present in any usage featuring "Black Card."[8]

## II.  BC's Black Card

### A. Black Card LLC

BC is a Wyoming limited liability company.  It developed a premium credit card product along with co-branding partners Barclays Bank Delaware ("Barclays") and Visa U.S.A., Inc. ("Visa"), which it began issuing in December 2008.  BC's card ("Black Card") is black in color, with a weave-patterned background.  The words "BLACK CARD" appear in contrast print, centered within the upper half of the card.  Next to name, card number, and expiration date in the lower half is the notation "CARDMEMBER SINCE [year]".  The blue and orange "Visa" logo sits in the lower right hand corner.  Black Card holders pay an

---

[8] For example, "The [Issuer Name] Black American Express Card" is an acceptable "first usage," and "The Black [Issuer Name] Card" is an acceptable "subsequent usage."  "The Black Card by/from American Express" is an example of an unacceptable usage.

annual fee and receive services and benefits including access to a "concierge", airport lounge access, travel insurance, rewards programs, and gifts.

B. Development of BC's Black Card

BC CEO Scott Blum ("Blum") has been a Centurion cardholder since Amex first introduced the card in 1999.  In the late 1990s, he had founded the Internet retailer Buy.com, which issued a black-colored credit card co-branded with Visa and Chase bank.  In 2005, Blum, then-CEO of an Internet company called Yub, Inc., ("Yub"), began developing a business concept for a black-colored premium credit card to be called the "Black Card".  In his deposition testimony, Blum explained that he was drawn to that particular name for a high-end card to be marketed to an affluent consumer base because "I wanted to have a name that I think the public would know as a high level of service, a high level product, a product that suggests quality and service."[9]  But, Blum also told Visa that his inspiration for the Black Card was his frustration with Centurion services as a long-time Centurion cardholder -- that he sought to build "a better Black Card."

---

[9] Blum later elaborated that "I think that the public would match black with a high level of service because it's been used for tens of years as being a high level in different industries."

On September 20, 2005, Yub applied to the PTO for the mark "BLACKCARD".  The PTO published the mark for opposition in May 2006.  No oppositions were filed, and the PTO issued a Notice of Allowance for the mark in August 2006.  After BC's incorporation in July 2007, Yub assigned its rights in the as-yet-unregistered mark to BC (in addition to rights in a number of related marks for which Yub had applied).

In July 2008, BC and Barclays entered into an agreement to issue a co-branded credit card.  Both parties then approached Visa, intending that the co-branded Black Card run on the Visa payment network.  Visa and BC entered into a co-branding agreement in November 2008; in that contract, BC indemnifies Visa for "any claims relating to the use of BLACK, BLACKCARD, BLACK CARD, or any mark incorporating the word "BLACK" either alone or as a composite mark with any other element . . . ."

A Visa executive has testified that Visa believed that BC could acquire trademark rights in "BLACKCARD" because Amex had let its rights in the mark "lapse."  In a November 5, 2008 e-mail from Blum to Visa's Garth Petersen, Blum wrote: "We also know that American Express canceled its application for the mark Black Card in 2007."  Both Barclays and Visa acknowledge their awareness of a link between "Black Card" and Amex, and a concern that Amex might seek to enforce trademark rights.  Anne-Marie Archino of Barclay's testified that "Barclays knows that Black

11

Card was out there in the industry, that there was – that the
Centurion Card was referred to as a Black Card."  Similarly,
Robin Binkley of Visa testified that "it is common knowledge
that the Centurion Card is often referred to as 'The Black
Card'."

    C. BC's Disclaimer

    As part of the co-branding agreement, Visa insisted that BC
disclaim any rights in the word "BLACK" on its own.  BC
resisted, out of a concern that a disclaimer would weaken any
registered mark.  On November 26, 2008, however, BC's trademark
attorney filed a disclaimer with the PTO to accompany two of its
applications, including the one that would ultimately be
registered several months later.  The disclaimers read:  "No
claim is made to the exclusive right to use BLACK apart from the
mark as shown."

    D. Registration of the Disputed Mark

    BC and its predecessors filed a total of thirteen
applications for registration of trademarks between 2005 and
2009.  Of these applications, the PTO issued a registration only
for the "BLACKCARD" mark.  The other applications included
"BLACKCARD" (stylized), "BLACK CARD" (script), "BLACK CARD"
(stylized), "BLACK CARD CONCIERGE", "BLACK CARD BENEFITS",
"BLACK CARD EXCLUSIVE REWARDS", "BLACK", "BLACK CARD TELLAPAL",
"MY BLACK CARD", "MY BLACK CARD REWARDS", "BLACK CARD REPORT",

and "BLACK CARD BUSINESS".  For several of these applications,
PTO examiners either refused to register or suspended BC's
applications on the grounds that the sought-after trademark was
merely descriptive.  Some examiners referenced the Centurion
card and requested that BC address whether "consumers
immediately [sic] this of a different provider of credit card
services in connection with use of the term 'black card'[.]"

     The trademark registration certificate for the "BLACKCARD"
mark issued on April 29, 2009.  The certificate, however, does
not make note of the voluntary disclaimer by BC in November
2008.  Amex and BC dispute the significance of the absence of
any reference to the disclaimer, primarily through the reports
of competing experts.  Amex's expert witness, former PTO
Assistant Commissioner for Trademarks Jeffrey M. Samuels,
asserts that the absence of the disclaimer on the registration
certificate or elsewhere in the PTO Examiner's file indicates
that the Examiner did not actually consider the disclaimer in
reaching her conclusion to register the mark.  According to
Samuels, had this procedural error not occurred, the
registration would not have issued, because "after giving effect
to the disclaimer, the mark would have consisted of no matter to
which exclusive rights were or could be claimed."  BC's expert,
former Administrative Trademark Judge on the Trademark Trial and
Appeal Board ("TTAB") Rany Simms, agrees that "there is no

record of the Examining Attorney ever acting upon" the
disclaimer.  But Simms argues that "BLACKCARD" is properly
considered a "unitary" mark, "for which no disclaimer would be
required or permitted."  If so, there was no procedural error,
and the mark is entitled to the rebuttable presumption of
distinctiveness accorded by virtue of PTO registration.

PROCEDURAL HISTORY

On April 28, 2009, the PTO issued registration for the
"BLACKCARD" mark to BC.  Amex filed a petition with the TTAB to
cancel registration of the "BLACKCARD" mark on May 13, 2009.  On
February 16, 2010, BC filed suit against Amex in the District of
Wyoming, seeking a declaratory judgment that Amex does not have
protectable rights in the marks BLACK CARD or BLACKCARD and that
BC's use of the marks does not infringe on any valid Amex
trademark right.  BC also brought claims alleging trademark
infringement, unfair competition under federal trademark law,
and unfair competition and trademark infringement under New York
law.

Amex filed the instant action on February 26, 2010.  In
addition to its cancellation claims under § 2(d) and § 2(e) of
the Lanham Act, Amex alleged trademark infringement and false
advertising under § 43(a) of the Lanham Act, cyberpiracy under §
43(d) of the Lanham Act, and unfair competition and

14

trademark/trade dress dilution under New York state law.  Amex's complaint sought both injunctive relief and monetary damages. Amex subsequently moved to dismiss the Wyoming suit as an anticipatory filing on March 1, 2010.

The TTAB suspended its proceedings pending the disposition of the federal lawsuits on May 7, 2010.  On November 5, 2010, the District Court in Wyoming granted Amex's motion and dismissed BC's complaint.  BC filed an amended answer to Amex's complaint on December 10, 2010, asserting its original Wyoming claims as counterclaims against Amex.  By stipulation of May 19, 2011, Amex's claims for monetary damages and BC's trademark infringement and unfair competition claims under both federal and New York law were dismissed with prejudice.

Following the completion of discovery, Amex and BC filed cross motions for summary judgment on May 23, 2011.  Amex moves for partial summary judgment under its Lanham Act § 2(e) cancellation claim.  BC moves for summary judgment on its own counterclaim for declaratory relief, as well as against all of Amex's claims.  The motions became fully submitted on July 27, 2011.  This Opinion addresses solely the cross-motions on the § 2(e) cancellation claim.

DISCUSSION

Summary judgment will be granted where, upon all of the submissions taken together, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).  When a non-moving party fails to oppose a motion for summary judgment, a court

> may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.  If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.

D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (citation omitted).

Under § 37 of the Lanham Act, a court "may determine the right to registration [and] order the cancelation of registrations, in whole or in part[.]"  15 U.S.C. § 1119. Section 14 of the Lanham Act permits "any person who believes that he is or will be damaged . . . by the registration of a

mark" to petition for the mark's cancellation.  15 U.S.C. § 1064.  Despite this broad designation of the class of persons who may challenge registration, courts have required the challenger to "have a 'real interest' in the proceedings and . . . a 'reasonable' basis for his belief of damage."  Ritchie v. Simpson, 170 F.3d 1092, 1095 (Fed. Cir. 1999).  A "real interest" in cancellation proceedings distinguishes a petitioner from a "'mere intermeddler' whom the standing requirements would bar from initiating cancellation proceedings."  Int'l Order of Job's Daughters v. Lindeburg & Co., 727 F.2d 1087, 1092 (Fed Cir. 1984).  Competition with the applicant is a "strong indication" that there is a reasonable basis for a belief of damage.  Famous Horse Inc. v. 5th Ave. Photo, Inc., 624 F.3d 106, 113 (2d Cir. 2010) (Lanham Act standing).

The Lanham Act provides that a mark "shall be refused registration" if it "[c]onsists of a mark which (1) when used on or in connection with the goods of the applicant is merely descriptive . . . of them[.]"  15 U.S.C. § 1052(e)(1).  This restriction of registration arises from the well recognized principle that "[t]o be valid and protectable, a mark must be capable of distinguishing the products it marks from those of others."  Lane Capital Management, Inc., v. Lane Capital Management, Inc., 192 F.3d 337, 344 (2d Cir. 1999).

"There are five different categories of terms with respect
to the protection of a mark:  generic, descriptive, suggestive,
arbitrary, and fanciful."  Id.  "Fanciful, arbitrary, and
suggestive marks are deemed inherently distinctive."  Id.
Descriptive marks are not and require a showing of secondary
meaning to be protectable.  Id.  Amex's § 2(e) cancellation
claim hinges on the often blurry distinction between descriptive
and suggestive marks.

"Descriptive marks are those consisting of words
identifying qualities of the product."  Star Indus., Inc., v.
Bacardi & Co. Ltd., 412 F.3d 373, 385 (2d Cir. 2005).  They
"convey an immediate idea of some characteristic or attribute of
the product[.]"  Papercutter, Inc., v. Fay's Drug Co., Inc., 900
F.2d 558, 562 (2d Cir. 1990).  A descriptive mark "is one that
tells something about a product, its qualities, ingredients or
characteristics.  It may point to a product's intended purpose,
its function or intended use, its size, or its merit."  Gruner +
Jahr USA Publishing v. Meredith Corp., 991 F.2d 1072, 1076 (2d
Cir. 1993).

A suggestive mark, on the other hand, "merely suggests the
features of the product, requiring the purchaser to use
imagination, thought, and perception to reach a conclusion as to
the nature of the goods."  Lane Capital, 192 F.3d at 344; see
also Star Indus., 412 F.3d at 385 ("Suggestive marks are those

18

that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of imagination, thought and perception." (citation omitted)).  As a matter of policy, the "guiding principle in distinguishing protectable from unprotectable marks is that no one enterprise may be allowed to attain a monopoly on designs that its competitors must be able to use in order to effectively communicate information regarding their products to consumers." Star Industries, 412 F.3d at 382.

The classification of a mark into one of the five categories is a question of fact.  "The factual issue presented is how the purchasing public views the mark. . . .  Further, the relevant purchasing public is not the population at large, but prospective purchasers of the product." Lane Capital, 192 F.3d at 344-45.

When the PTO issues a certificate of registration for a mark, a rebuttable presumption arises that the mark is protectable.  Papercutter, 900 F.2d at 562-63.  "Registration by the PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." Lane Capital, 192 F.3d at 345.  The fact of registration, however, "shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such

19

mark had not been registered." 15 U.S.C. § 1115(a). The party challenging the registration "bears the burden to rebut the presumption of [the] mark's protectability by a preponderance of the evidence." Lane Capital, 192 F.3d at 345. "The presumption may be rebutted by a showing that the mark is descriptive, not suggestive." Papercutter, 900 F.2d at 563.

The presumption, in short, is a "procedural advantage" to the registrant and nothing else. Lane Capital, 192 F.3d at 345. It is not "itself evidence of how the public actually views the mark." Id. "The presumption of validity that federal registration confers evaporates as soon as evidence of invalidity is presented. Its only function is to incite such evidence, and when the function has been performed the presumption drops out of the case." Id. (citation omitted).[10]

It is assumed without deciding that the mark "BLACKCARD" is entitled to a rebuttable presumption of protectability by virtue of its 2009 PTO registration.[11] Amex has demonstrated by a preponderance of the evidence, however, that the mark is

---

[10] Amazing Spaces, Inc. v. Metro Mini Storage, 608 F.3d 225, 239 (5th Cir. 2010), cited by BC, has also adopted a similar rebuttable presumption test.

[11] The parties hotly dispute whether procedural error by the PTO Examining Attorney should nullify the presumption. The parties' experts agree that there is no record that the PTO Examining Attorney ever acted upon the disclaimer that BC filed to disclaim any rights to the word "Black" alone. BC argues that the mark is a unitary one for which no disclaimer was permissible or necessary.

descriptive, and thus not protectable absent secondary meaning. No reasonable factfinder could find that a prospective consumer would consider the mark to be suggestive rather than descriptive.

BC's mark BLACKCARD[12] appears on a black-colored credit card.  As with other credit cards, it enables its holders to make purchases on credit.  The black color of the card is an essential feature or characteristic of the card.  BC's advertising emphasizes the color, underscoring this point.[13]

Within the credit card industry, the word "black" is descriptive in a second sense as well.  Largely through the efforts of Amex, the word "black", when used in connection with credit cards is understood to describe access to premium credit

---

[12] The PTO registered the mark "BLACKCARD", i.e. without a space between the words.  An application for the mark "BLACK CARD" has been stayed pending the outcome of this litigation.  In its application for a stylized version of the "BLACK CARD" mark, BC applied to amend the application to remove the space in September 2007.  It justified the amendment by stating that the removal of the space "does not change the general commercial impression of the mark, because the mark as amended retains the same overall look, spelling and connotation, but merely changes the mark from two words to one word, and, therefore, creates the impression of being the same mark."  BC's explanation to the PTO was sensible, and the fact that the mark is one word rather than two does not alter its descriptive nature.

[13] While not essential to the holding in this Opinion, BC's disclaimer of any exclusive right to the word BLACK is further evidence that BC did not intend or believe that the word could be used as a mark to distinguish its products from those of its competitors.

card services.   Indeed, this was the very reason that Blum chose

the mark "BLACKCARD" for his credit card.[14]   The term "BLACKCARD"

immediately calls to mind an important aspect or characteristic

of the product and describes the product's principal features

and qualities.   It is, in essence, communicating the grade of

credit card offered by BC.   The black-colored credit card

marketed by BC is central enough to the overall product, however

defined, to render "BLACKCARD" a descriptive mark.

A descriptive mark is still protectable if the mark's

proponent can demonstrate secondary meaning in the mark.   BC has

offered no evidence of secondary meaning accruing to the mark

"BLACKCARD", and does not pursue this line of argument in its

briefs.[15]   Accordingly, summary judgment for Amex on its

---

[14] In its first major national advertisement, BC was at pains to
distinguish itself from the crowded field of premium credit
cards:   "The Black Card is not just another piece of plastic.
Made with carbon graphite, it is the ultimate buying tool."

[15] In contrast, Amex submitted two consumer surveys in support of
its argument that secondary meaning in the mark "black card" has
accrued to Amex.   The surveys were conducted by Hal Poret
("Poret Survey") and George Mantis ("Mantis Survey").
    The Poret Survey surveyed a sample of 200 individuals with
a household income of $250,000 or more.   33.5% of respondents
stated that they associated "Black Card" with only one company:
Amex.   Surveying an ostensibly broader group, those who
currently have or within the next year will consider getting a
credit, charge, or debit card with an annual fee of $450 or
more, the Mantis Survey found that 19.4% of respondents
indicated a unique association of the name "Black Card" with
Amex.

cancellation claim under § 2(e) of the Lanham Act is
appropriate.

BC makes two arguments against cancellation.  First, it
argues that Amex lacks standing to bring a cancellation claim.
Second, BC argues that its mark is suggestive of the services
offered by BC and its partners, and thus protectable even in the
absence of secondary meaning.

Amex has standing to challenge registration of the
"BLACKCARD" mark.  It has a significant, concrete, and real
interest in proceedings to challenge the registration.  Amex
markets its own black-colored credit card and has referred to
the Centurion as "the black card" in communications to
prospective customers.  Indeed, BC sued Amex for infringement.
Amex has a strong incentive to preserve its ability to use the
mark in commerce in the very market niche in which BC operates.
No more is required to establish standing to bring a
cancellation claim.[16]

_____

[16] The cases cited by BC are not to the contrary.  Future Media
Architects, Inc. v. Deutsche Luftansa AG arose out of a dispute
over rights to the domain name www.lh.com.  No. 08 Civ. 2801
(LAK), 2008 WL 2686622 (S.D.N.Y. July 8, 2008).  The defendant
operates Lufthansa Airlines.  The court held that the plaintiff
had no standing to bring a claim to cancel the defendant's
registration in the "Lufthansa" mark since it had no "reasonable
basis" for a belief that it would be damaged in the absence of
cancellation.  Id. at *1.  Similarly, in Yurman Design Inc. v.
Chaindom Enters., Inc., No. 99 Civ. 9307 (JFK), 2000 WL 897141,
at *1 (S.D.N.Y. July 5, 2000), a party had no standing to seek
cancellation of a mark because it had "no commercial or

BC's second argument boils down to the following:  the mark
BLACKCARD is suggestive of high-end financial services.
Certainly, in the cases on which BC relies, Giorgio Beverly
Hills Inc. v. Revlon Consumer Products Corp., 869 F.Supp. 176,
180-81 (S.D.N.Y. 1994), and Guinness United Distillers &
Vintners B.V. v. Anheuser-Busch, Inc., No. 02 Civ. 0861 (LMM),
2002 WL 1543817, at *3 (S.D.N.Y July 12, 2002), the name of a
color was held to be a protectable mark.  In both Giorgio and
Guinness, the product was a golden-hued liquid (perfume and
scotch whiskey, respectively) contained in a bottle with red
trade dress; the marks were "RED" and "Red Label", respectively.
In the case of the Red Label mark, the court noted that the mark
did not serve as a grade designation and, relying on evidence of
secondary meaning such as the manufacturer's advertising
campaign, found that the mark functioned to distinguish the
product from other alcoholic beverages.  Guinness, 2002 WL
1543817, at *3.

   While the line between a descriptive and a suggestive mark
can be difficult to draw, in this case "BLACKCARD" is
descriptive of both the physical manifestation of the credit
card and of the niche credit card services that can be accessed

---

pecuniary interest" that would be damaged by the registration.
Id. at *4.  Finally, Momentum Luggage & Leisure Bags v.
Jansport, Inc., No. 00 Civ. 7909 (DLC), 2001 WL 830667 (S.D.N.Y.
July 23, 2001), is inapposite.  It involved an infringement, not
a cancellation claim.  Id. at *5.

through the card.  While "RED" may have suggested romance and passion to the purchasers of Giorgio's perfume, Giorgio, 869 F.Supp. at 181, "BLACKCARD" merely describes the color of the card and the category of credit card services into which BC's card falls.

CONCLUSION

Amex has demonstrated that summary judgment is appropriate on its claim that the PTO registration of BC's "BLACKCARD" mark should be cancelled because the mark is not inherently distinctive and BC has not demonstrated secondary meaning. Amex's motion for summary judgment on its § 2(e) cancellation claim is granted and BC's motion for summary judgment on that claim is denied.

    SO ORDERED:

Dated:    New York, New York
          November 17, 2011

                                    _____
                                    DENISE COTE
                          United States District Judge